T.C. Memo. 2019-142

UNITED STATES TAX COURT

SEYED-JALIL GHADIRI-ASLI AND MOJDEH NAJLE-RAHIM, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15855-15.                    Filed October 23, 2019.

Seyed-Jalil Ghadiri-Asli and Mojdeh Najle-Rahim, pro sese.[1]

Sebastian Voth and Kevin R. Oveisi, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  Respondent determined deficiencies and fraud

penalties under section 6663 with respect to petitioners' Federal income tax for

_____

    [1]Steven R. Mather represented petitioners at the trial of this case.  Mr.
Mather withdrew as petitioners' counsel on January 30, 2019.  Thereafter,
petitioners acted pro sese.

[*2] taxable years 2009, 2010, and 2011 (years at issue) as follows:[2]

| Year | Deficiency | Penalty sec. 6663[1] |
|------|-----------|---------------------|
| 2009 | $106,052 | $70,874 |
| 2010 | 197,421 | 116,570 |
| 2011 | 148,247 | 109,685 |

[1]Respondent determined, as an alternative to the fraud penalties, that petitioners are liable for sec. 6662(a) accuracy-related penalties of $2,310, $8,398, and $400 for taxable years 2009, 2010, and 2011, respectively.

[2]All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. Monetary amounts are rounded to the nearest dollar.

**[\*3]** After concessions,[3] the issues for decision are whether petitioners, husband and wife: (1) failed to report income received by petitioner Mojdeh Najle-Rahim's (Dr. Najle-Rahim) medical practice; (2) overstated Dr. Najle-Rahim's medical practice's deductions; and (3) failed to report petitioner Seyed-Jalil Ghadiri-Asli's 2010 lawsuit settlement proceeds as income. Also at issue is whether petitioners are liable for the section 6663 civil fraud penalty (or alternatively the section 6662(a) accuracy-related penalty).

---

[3]With respect to taxable year 2009, petitioners concede in full respondent's disallowance of (1) losses from Form 4797, Sales of Business Property, of $9,100; (2) medical, dental, and insurance premium itemized deductions of $28,720; and (3) exemptions of $15,818. Respondent concedes a self-employed health insurance deduction of $9,700. With respect to respondent's adjustment of $6,000 regarding a charitable contribution deduction, each party concedes $3,000.

With respect to taxable year 2010, petitioners concede in full respondent's disallowance of (1) medical, dental, and insurance premium itemized deductions of $24,937; (2) exemptions of $10,950; and (3) a real estate loss (after passive limitation) of $25,000. Respondent concedes a self-employed health insurance deduction of $16,800. With respect to respondent's adjustment of $2,700 regarding a charitable contribution deduction, each party concedes $1,350.

With respect to taxable year 2011, petitioners concede in full respondent's disallowance of (1) medical, dental, and insurance premium itemized deductions of $19,500; (2) exemptions of $11,100; and (3) a real estate loss (after passive limitation) of $25,000. Respondent concedes a self-employed health insurance deduction of $22,000. With respect to respondent's adjustments of $2,700, regarding a charitable contribution deduction, each party concedes $1,350.

[*4]                         FINDINGS OF FACT[4]

Some facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. When they petitioned this Court, petitioners resided in California.

I.      Mr. Ghadiri-Asli's Background and Lawsuit Settlement

Mr. Ghadiri-Asli holds a bachelor of science degree in industrial and manufacturing engineering. After college he worked for several different firms in the aerospace industry before taking a position with Deutsch Engineered Connecting Devices (Deutsch), where he worked as an industrial engineer from 2003 to 2007. In this capacity he had significant management responsibilities and was also responsible for finding manufacturing materials, reducing costs, creating systems, modifying existing designs, and fixing manufacturing errors.

Mr. Ghadiri-Asli left his position with Deutsch under circumstances he stated that he was not permitted to discuss. In any event, the circumstances of his leaving caused him significant physical and mental health problems. In 2007 Mr.

---

[4]Petitioners' seriatim answering brief failed to set forth objections to respondent's proposed findings of fact as directed by Rule 151(e)(3). Accordingly, we deem petitioners to have conceded respondent's proposed findings of fact as correct except to the extent that petitioners' proposed findings of fact are clearly inconsistent therewith. See Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002), aff'd, 353 F.3d 1181 (10th Cir. 2003).

[*5] Ghadiri-Asli filed a lawsuit against Deutsch and an individual named Paul Titcombe, alleging, among other things, employment discrimination and wrongful termination. The lawsuit settled in 2010 for $90,000. The settlement agreement, signed April 27, 2010, states: "The Parties agree that the Settlement amount is to compensate Ghadiri [Mr. Ghadiri-Asli] for alleged emotional distress. Ghadiri [Mr. Ghadiri-Asli] alleges that there were physical manifestations thereof." The $90,000 settlement amount was paid by check made payable to Mr. Ghadiri-Asli's attorney's client trust fund account. Sometime later in 2010 Mr. Ghadiri-Asli received a check from his attorney's law firm for $55,000, representing the $90,000 settlement amount less attorney's fees of $35,000. Petitioners reported no part of the settlement proceeds and claimed no deduction for attorney's fees on their 2010 Federal income tax return.

During the years at issue Mr. Ghadiri-Asli was unemployed. He assisted in maintaining the marital home and caring for his and Dr. Najle-Rahim's children. In addition, as discussed in more detail below, he assisted Dr. Najle-Rahim in administrative aspects of her medical practice, including handling certain tax documents and depositing checks.

**[*6]** II.     Dr. Najle-Rahim's Background

Dr. Najle-Rahim earned her medical degree in 1995.  In 2006 she was certified as a specialist in infectious disease by the American Board of Internal Medicine, and in 2007 she started her own medical practice focusing on infectious disease.  During the years at issue she operated the practice as a sole proprietorship.

As an infectious disease specialist, Dr. Najle-Rahim diagnosed and treated communicable diseases such as pneumonia, endocarditis, meningitis, and sepsis.  To begin diagnosis and treatment of a patient, Dr. Najle-Rahim would speak with the patient and review all of his or her records, including lab and radiology reports.  Depending on the circumstances, she would order additional tests, such as blood or urine tests, or prescribe medication.  She would follow up by checking the results of any tests ordered, reviewing the progress of the patient, and adjusting the treatment as necessary.  Dr. Najle-Rahim recorded all of the services she provided to her patients on "face sheets" that were included in the patients' charts.

Dr. Najle-Rahim was compensated for her services mainly by payments from Medicare, Medi-Cal, and insurance companies (third-party payors), as well as copayments made by patients.

**[*7]**  Dr. Najle-Rahim's rent for her medical practice was no more than $400 per month until February 2011, when it increased to $1,000 per month.

III.    Medical Practice Administration

    A.    Billing

Dr. Najle-Rahim did not maintain books and records for her medical practice or employ a bookkeeper.  To administer billing and collect fees from third-party payors for the services she provided, Dr. Najle-Rahim hired an outside company, C&L Professional Billing Services (C&L).

C&L was established in 1998 by Candace MacSween, a registered nurse, and Lois Kahoilua, an experienced business administrator in the health industry. C&L employed 15 individuals and provided billing services for 35 to 40 doctors each year in a wide variety of practices, including general practitioners, cardiologists, endocrinologists, and general surgeons.  For its services C&L charged a fee or commission of 6% of the payments the client-doctor received from payors.

Dr. Najle-Rahim would generally begin the billing process by mailing copies of her patients' face sheets to C&L, which would then scan them and enter the information into its computer system.  C&L would establish a record for each patient and identify the medical procedures performed with a current procedural

[*8] terminology code. A claim would then be generated, either on paper or electronically, and sent to the payor to respond, "hopefully with a payment," as Ms. MacSween stated.

Any payment would be sent directly to Dr. Najle-Rahim (not to C&L) along with an explanation of benefits, indicating the date and level of service, the payment method and amount, and whether any residual amount was billable to another party. Other correspondence regarding billing issues would also be sent directly to Dr. Najle-Rahim. If the correspondence related to a billing issue, e.g., a request for additional information, Dr. Najle-Rahim would send a copy of the correspondence to C&L for followup.

About once a week Dr. Najle-Rahim would mail to C&L a packet containing copies of the explanation of benefits forms and other correspondence. Upon receiving the packet, C&L would analyze the explanation of benefit forms to determine whether the third-party payor had properly paid the claim and whether any additional billing should be made either to the patient or to a secondary insurance company. If Dr. Najle-Rahim had other correspondence regarding billing issues, C&L would contact the payor to follow up.

In addition to providing billing services, C&L offered collection assistance to its clients, including Dr. Najle-Rahim. Such collection assistance generally

[*9] involved recovering patient copays. C&L would bill the patient for copays if the doctor had not collected them at the time of service. If the patient failed to respond to three bills, C&L would consult with the client before taking any additional steps. Upon the client's express request, C&L would contact a collection agency (during the years at issue C&L engaged Financial Debt Recovery) to collect any unpaid balances on the client's behalf. Once a bill was sent to a collection agency, C&L would show it as a writeoff in the monthly client summary. Should the collection agency eventually collect the money, it would keep a percentage and send a check to Dr. Najle-Rahim for the balance.

At the end of each month Ms. MacSween and Ms. Kahoilua would review all of C&L's clients' documentation, including Dr. Najle-Rahim's, to ensure that all amounts were properly billed. Ms. MacSween would then prepare and send a monthly summary to each client, including Dr. Najle-Rahim. The data reported on Dr. Najle-Rahim's monthly summary was taken directly from the explanations of benefits C&L received from her. Each monthly summary consisted of a general ledger report that ran from the first through the last day of the month. The summaries for Dr. Najle-Rahim's medical practice reported the dates Dr. Najle-Rahim performed medical services; "total charges" (i.e., the gross charges) generated by the services provided; "corrected charges", reflecting errors that were

[*10] subtracted from claims; "writeoffs", representing amounts that the billed payors had failed to pay (but that might still be collected through a collection agency); "total payments", representing actual payments made during the month as stated on each explanation of benefits; "net charges", representing the difference between total payments and any corrections; "net payments", representing payments less refunds paid; and "payment refunds", representing payors' overpayment claims against Dr. Najle-Rahim.

Attached to each monthly summary was an invoice showing the total monthly payments received by Dr. Najle-Rahim, a calculation of the 6% fee owed to C&L, and an amount due for reimbursement of C&L's postage expenses. The 6% fee was based on the payments received by Dr. Najle-Rahim as reported to C&L on the explanation of benefits forms.

C&L also provided its clients, including Dr. Najle-Rahim, with annual reports, summarizing the monthly reports.

After reviewing the C&L monthly reports, Dr. Najle-Rahim would sometimes contact Ms. Kahoilua about seeming discrepancies between amounts that C&L reported as payments to her and the amounts deposited into petitioners' bank accounts. On one occasion both petitioners met with Ms. MacSween and Ms. Kahoilua to discuss these seeming discrepancies, which C&L attributed to

[*11] timing differences between C&L's monthly summaries and petitioners' bank statements. Despite these disputes, Dr. Najle-Rahim always timely paid the full amount of C&L's fees as shown on each invoice.[5]

B.    Payments

As noted above, third-party payors billed by C&L mailed payments directly to Dr. Najle-Rahim. Mr. Ghadiri-Asli assisted Dr. Najle-Rahim in opening the mail and depositing the checks into petitioners' bank accounts. During the years at issue petitioners regularly deposited checks into their banking accounts but failed to maintain any records as to their income.

1.    Medi-Cal

Medi-Cal, the State of California's Medicaid program, serves low-income individuals. During the years at issue, Medi-Cal used a contractor, Conduent, to administer payments to physicians who provided services to Medi-Cal patients. Dr. Najle-Rahim received from Medi-Cal, through Conduent, payments of $96,107 in 2009, $103,141 in 2010, and $85,843 in 2011.

---

[5]On their tax returns petitioners deducted commissions paid to C&L of $27,743 for 2009, $34,800 for 2010, and $29,670 for 2011.

**[*12]**      2.      San Bernardino Medical Group

San Bernardino Medical Group is a medical group that contracts with physicians to provide services for patients.  It acts as a go-between for doctors and private insurance providers, paying the doctors for the services they provide.  San Bernardino Medical Group paid Dr. Najle-Rahim $13,791 in 2009, $32,132 in 2010, and $17,391 in 2011.[6]

3.      Medicare

During the years at issue Medicare engaged Palmetto GBA, LLC, to make payments to physicians in California.  According to the Forms 1099-MISC issued by Palmetto GBA, LLC, Dr. Najle-Rahim received Medicare payments of $191,532 in 2009, $207,893 in 2010, and $230,705 in 2011.

IV.   Household Finances

Mr. Ghadiri-Asli and Dr. Najle-Rahim held a joint bank account, and they each also had separate bank accounts.  During the years at issue, petitioners' bank

---

[6]For reasons unexplained in the record, San Bernardino Medical Group did not report the full amounts paid to Dr. Najle-Rahim each year on the Forms 1099-MISC, Miscellaneous Income, that it filed with the Internal Revenue Service (IRS).  The Forms 1099-MISC failed to include each year's final payment made to Dr. Najle-Rahim.  Thus, the 2009 Form 1099-MISC reported $13,436, the 2010 Form 1099-MISC reported $31,930, and the 2011 Form 1099-MISC reported $15,385.  In the determinations in the notice of deficiency, respondent used the numbers from the C&L summaries rather than from these Forms 1099-MISC.

**[*13]** account balances were growing. Petitioners each had at least one credit card and timely paid their monthly balances. Petitioners had a mortgage on their home and made their monthly payments on time. During the years at issue, petitioners had no financial problems.

## V.    Preparing and Filing Petitioners' Federal Income Tax Returns

Petitioners engaged Clinton M. Young to prepare their Federal income tax returns for the years at issue. Mr. Young has been a California registered tax return preparer since 1992. At the time of trial he had more than 1,000 clients.

Mr. Young has a background in business finance. He is not a certified public accountant or an enrolled agent and never holds himself out as anything other than a tax return preparer. He does not perform bookkeeping or accounting services for his clients but relies on the accuracy of the information they bring him. To that end, he expects clients to provide him with their books and records, as well as income reporting forms, such as Forms W-2, Wage and Tax Statement, or Forms 1099-MISC. He also provides each client an expense-reporting template on which he relies in preparing the client's income tax return. The expense-reporting template has preprinted expense categories and subcategories, as well as spaces for taxpayers to make customized entries. Mr. Young informs his clients

**[*14]** that he does not want to see their underlying receipts unless there is a "major" question regarding the deductibility of those expenses.

In preparing petitioners' Federal income tax returns Mr. Young worked with Mr. Ghadiri-Asli, never with Dr. Najle-Rahim. Sometimes, however, when Mr. Young had a question, Mr. Ghadiri-Asli would call Dr. Najle-Rahim for an answer.

For the years at issue, petitioners gave Mr. Young some, but not all, of the Forms 1099-MISC reporting income received by Dr. Najle-Rahim. Petitioners never provided Mr. Young any of C&L's monthly or annual summaries, any C&L invoices, or any bank records. Mr. Young was aware that petitioners' income came mostly from Dr. Najle-Rahim's medical practice and would probably be mainly in the form of insurance payouts, for which Forms 1099-MISC would most likely be issued. He therefore specifically asked Mr. Ghadiri-Asli: "This is what the 1099s you show me added up to. Does this look accurate to you, et cetera, et cetera?". Mr. Ghadiri-Asli responded "[i]n the positive that he assumed these information pieces that were given to him, presumably from what he told me by his spouse, by the doctor, were correct."

As was his custom, in preparing each year's Federal income tax return Mr. Young provided petitioners with his expense-reporting template. When Mr.

[*15] Ghadiri-Asli returned the completed template to Mr. Young, he represented that Dr. Najle-Rahim had filled it out. Upon receiving the filled-out template, Mr. Young asked petitioners to confirm the accuracy of the information on it. They did so but provided no other information to Mr. Young regarding their expenses.

Mr. Young uses tax preparation software to prepare tax returns. The software generates what Mr. Young refers to as "overflow sheets", which provide more detail than would normally be seen on a tax return. For instance, whereas Schedule C, Profit or Loss From Business, has a line for "Office expense", Mr. Young's overflow sheet would show the various components of the entry for that single line item.

After preparing a draft Federal income tax return, Mr. Young would review it with Mr. Ghadiri-Asli. The review included a line-by-line review of the amounts entered on the main tax form and the attached schedules. Mr. Ghadiri-Asli would take the completed tax form for Dr. Najle-Rahim to review. Mr. Young never received any questions or comments from Dr. Najle-Rahim.

When Mr. Young was preparing petitioners' 2010 Federal income tax returns, Mr. Ghadiri-Asli told him that some of the Forms 1099-MISC were incorrect, reporting $42,000 of income that petitioners had never received. Mr. Ghadiri-Asli wanted to know what could be done. Mr. Young advised him that

**[\*16]** one option was to report the amounts stated on the disputed Forms 1099-MISC and then subtract the disputed amounts as an adjustment. This was an approach that Mr. Young had previously used. Mr. Young advised Mr. Ghadiri-Asli: "[I]f you're questioned, you prove that you didn't actually have that income." After a discussion they agreed to use the disputed amounts reported on the Form 1099-MISC and deduct the $42,000 of disputed income.[7]

VI.   Examination of Petitioners' Income Tax Returns

In April 2012 Revenue Agent Jennifer Cota was assigned to examine petitioners' returns for taxable years 2009, 2010, and 2011. She began her examination by issuing an information document request (IDR) for (1) petitioners' Forms 1040, U.S. Individual Income Tax Return, and other tax forms, (2) copies of prior audit reports, (3) bank account information for the period between January 1 and December 31, 2010, (4) Form 1040 and Schedule C work papers,

---

[7]For petitioners' taxable year 2010, Mr. Young prepared two Schedules C for Dr. Najle-Rahim's medical practice because she performed medical services at two locations that year. On one of the Schedules C, "Medical Doctor 2nd", petitioners reported total gross receipts of $42,000--the same as the disputed income claimed on the first Schedule C. On the other Schedule C, "Medical Doctor", petitioners reported $385,394 of gross receipts and deducted as an "other expense" $42,000 of "disputed income". In the notice of deficiency, respondent made an adjustment reallocating the "Medical Doctor 2nd" Schedule C gross receipts of $42,000 to the other Schedule C, stating: "The allocation of income and expenses to a separate Schedule C is disregarded for tax purposes."

[*17] (5) receipts for business expenses, and (6) other financial information. Revenue Agent Cota requested that petitioners provide the information by the time of an upcoming scheduled appointment with them on May 22, 2012. Petitioners failed to provide any of the requested documents.

On August 3, 2012, Revenue Agent Cota sent petitioners a second IDR, requesting (1) copies of employment tax returns, (2) bank statements (with specific banks and accounts identified) for the period between December 1, 2009, and January 31, 2011, (3) Schedule C records of income (such as invoices), and (4) records to substantiate expenses reported on Schedule C and Schedule E, Supplemental Income and Loss. The requested information was due at petitioners' next scheduled appointment on August 17, 2012. Petitioners provided statements for one bank account but failed to provide any of the other requested documents.

On August 20, 2012, Revenue Agent Cota sent petitioners a third IDR, requesting (1) bank statements (again including specific accounts) for the periods between December 1, 2008, and January 31, 2010, and between December 1, 2010, and January 31, 2012, (2) information regarding nontaxable income (such as gifts, inheritances, loan proceeds, etc.), (3) records related to Schedule C income, (4) insurance policies, and (5) records to substantiate Schedule C and Schedule E expenses. The requested information was due at petitioners' next scheduled

[*18] appointment on September 14, 2012.  Petitioners failed to provide the requested documents.

On October 25, 2012, Revenue Agent Cota sent petitioners a fourth IDR, requesting information for taxable years 2009, 2010, and 2011 with respect to (1) any nontaxable income, including documentation to support their claim that a $55,000 deposit made on May 20, 2010, was not taxable,[8] (2) 2009 and 2011 tax return work papers, (3) documentation to substantiate gross receipts included on Schedule C, (4) a listing and copies of all Forms 1099-MISC petitioners asserted were incorrect, (5) C&L records including contracts and statements, (6) documentation to substantiate Schedule C and Schedule E expenses, (7) bank statements with respect to the periods between December 1, 2008, and January 31, 2010, and between December 1, 2010, and January 31, 2012, and (8) information regarding car expenses.  The requested information was due at petitioners' next scheduled appointment on November 9, 2012.  Petitioners failed to provide the requested documents.

Revenue Agent Cota had seven meetings with Mr. Ghadiri-Asli and one meeting with both petitioners.  Mr. Ghadiri-Asli provided a handwritten summary

---

[8]This amount appears to relate to Mr. Ghadiri-Asli's lawsuit settlement, for which he received a $55,000 net payment from his attorney's firm.

[*19] of what he claimed were totals for office expenses but otherwise provided no substantiation. He also provided the expense-reporting template that petitioners had given to Mr. Young. And although Mr. Ghadiri-Asli provided Revenue Agent Cota with statements for one of petitioners' bank accounts, petitioners did not disclose 17 of the 18 bank accounts they held in 2009 and 2010 or 20 of the 21 bank accounts they held in 2011.

Because petitioners provided hardly any of the information requested in the IDRs, Revenue Agent Cota summoned their bank account records from Wells Fargo Bank, Bank of America, Wachovia Bank, and Chase Bank. Revenue Agent Cota identified petitioners' bank accounts by reviewing documents, such as the Forms 1099-MISC, that were issued by these banks reporting interest earned on petitioners' bank accounts. As she summoned information, Revenue Agent Cota became aware of other bank accounts, and her analysis of check disbursements identified further accounts maintained by petitioners. Petitioners provided almost no assistance to Revenue Agent Cota as she identified their bank accounts.

Revenue Agent Cota reconstructed petitioners' income and expenses using the bank deposits method. As part of this analysis she reviewed all items deposited into the bank accounts to identify the dates and sources of the funds and the identities of the payors. She calculated petitioners' income by adding all of the

[*20] deposits that were made into each account and reducing this sum by all identifiable nontaxable deposits, for example by identifying transfers between accounts (via electronic transfers or checks transferring money between petitioners' bank accounts). Petitioners did not cooperate with Revenue Agent Cota's requests for input on what items were nontaxable, and even after being given the summary information they did not explain what part of Revenue Agent Cota's analysis they were disputing.

Revenue Agent Cota created spreadsheets summarizing the findings of her bank deposits analysis for each year at issue. The spreadsheets identified each of petitioners' bank accounts and showed (1) yearly beginning and ending balances, (2) total deposits (less interest), (3) nontaxable transfers, (4) taxable deposits, (5) taxable interest, (6) withdrawals, (7) transfers out (personal/rental), (8) business income, and (9) "SE health". On the basis of the disbursements indicated by her bank deposits analysis, Revenue Agent Cota computed Dr. Najle-Rahim's allowable business expenses.

To supplement her bank deposits analysis, Revenue Agent Cota reviewed transcripts of all of the Forms 1099-MISC submitted to the IRS by third-party payors with respect to petitioners. She also summoned C&L to obtain copies of invoices sent to Dr. Najle-Rahim as well as the monthly and annual summaries of

[*21] Dr. Najle-Rahim's billings.  She also contacted Mr. Young to discuss his preparation of petitioners' Federal income tax returns for the years at issue.  Mr. Young explained the expense deductions claimed and showed Revenue Agent Cota the overflow sheets he had generated.

After Revenue Agent Cota had summoned petitioners' banks, she met with Mr. Young and Mr. Ghadiri-Asli.  The meeting was short.  Revenue Agent Cota told Mr. Young about the understatements of income she had found.  Mr. Young's response to Revenue Agent Cota, as he recalled it at trial, was:

> I need to probably confer with my client some more * * * and talk about this.  And at that point, I think that he [Mr. Ghadiri-Asli] was supposed to bring some additional copies of bank records that at that point he [Mr. Ghadiri-Asli] did not have yet.  So he [Mr. Ghadiri-Asli] didn't have anything else to turn over to her [Revenue Agent Cota].  So we kind of just ended the meeting, and we left the building.

Mr. Young told Mr. Ghadiri-Asli that he should probably seek legal counsel.  Mr. Young did not see Mr. Ghadiri-Asli again until trial.

The following table summarizes the gross receipts petitioners reported on the Schedules C of their Federal income tax returns as well as gross receipts (1) as calculated in the bank deposits analysis, (2) as reported to C&L by Dr. Najle-Rahim, and (3) as reported on the Forms 1099-MISC:

**[*22]**

<u>Gross receipts</u>

| Year | Tax return | Forms 1099-MISC | C&L | Bank deposits analysis |
|------|------------|-----------------|-----|------------------------|
| 2009 | $422,000 | $473,736 | $453,030 | $473,156 |
| 2010 | 427,394 | 623,137 | 570,908 | 646,036 |
| 2011 | 275,323 | 514,364 | 515,949 | 539,650 |

The following tables summarize Dr. Najle-Rahim's expense deductions as claimed by petitioners and the amounts respondent allowed upon completion of the examination for the years at issue:

[*23]                              2009 Schedule C

| Expense | Amount claimed | Amount allowed | Difference |
|---|---|---|---|
| Advertising | $3,000 | -0- | $3,000 |
| Car and truck | 38,250 | -0- | 38,250 |
| Contract labor[1] | 27,743 | $26,526 | 1,217 |
| Depreciation | 19,407 | -0- | 19,407 |
| Insurance | 20,000 | 7,450 | 12,550 |
| Legal and professional service | 5,400 | -0- | 5,400 |
| Office | 3,500 | -0- | 3,500 |
| Rent or lease | 16,120 | 2,955 | 13,165 |
| Supplies | 23,300 | -0- | 23,300 |
| Travel | 12,100 | -0- | 12,100 |
| Meals and entertainment | 2,000 | -0- | 2,000 |
| Wages | 25,000 | -0- | 25,000 |
| Other | [2]38,630 | [3]1,781 | 36,849 |

[1]Petitioners reported the C&L billing fees as contract labor.

[2]Petitioners' "other expenses" consisted of $6,400 for "communications", $9,300 for "professional dues and fees", $5,100 for "uniforms and upkeep", and $17,830 for "continuing education".

[3]Expenses allowed by respondent consisted of $95 of "dues", $148 for "telephone expenses", and $1,538 for "licenses and fees".

[*24]

2010 Schedule C

| Expense[1] | Amount claimed | Amount allowed | Difference |
|---|---|---|---|
| Advertising | $2,900 | -0- | $2,900 |
| Car and truck | 26,350 | -0- | 26,350 |
| Contract labor | 34,800 | $36,335 | (1,535) |
| Depreciation | 9,578 | -0- | 9,578 |
| Insurance | 33,600 | 9,372 | 24,228 |
| Legal and professional service | 5,625 | -0- | 5,625 |
| Office | 7,146 | -0- | 7,146 |
| Rent or lease | 42,624 | 2,000 | 40,624 |
| Repairs and maintenance | 1,736 | -0- | 1,736 |
| Supplies | 38,900 | 170 | 38,730 |
| Taxes and licenses | 72 | -0- | 72 |
| Travel | 12,960 | -0- | 12,960 |
| Meals and entertainment | 3,000 | -0- | 3,000 |
| Utilities | 2,808 | -0- | 2,808 |
| Wages | 936 | -0- | 936 |
| Other | [2]110,207 | [3]1,524 | 108,683 |

[1]As noted, petitioners filed two Schedules C with their 2010 return reporting the income and expenses of Dr. Najle-Rahim's medical practice.  Petitioners reported $42,000 of gross receipts on the second Schedule C but deducted as an "other expense" $42,000 of "disputed income" on the first Schedule C.  For clarity's sake, we have combined petitioners' reported expenses on the two Schedules C and the amounts respondent allowed.

[2]With respect to the first Schedule C, petitioners' "other expenses" consisted of $14,200 for "communications", $11,000 for "professional dues and fees", $42,000 for "disputed income" (this $42,000 of disputed income matches the $42,000 of gross receipts reported on the second Schedule C), $10,115 for "uniforms and upkeep", and $22,860 for "continuing education".  The second Schedule C reported "other expenses" of $3,295 for "security", $4,573 for "communications", and $2,164 for "internet".

[3]Expenses allowed by respondent consisted of $738 for "business registration" and $786 for the "licensing fees" paid to the Medical Board of California.

[*25]                                         2011 Schedule C

| Expense | Amount claimed | Amount allowed | Difference |
|---|---|---|---|
| Advertising | $4,120 | -0- | $4,120 |
| Car and truck | 8,467 | -0- | 8,467 |
| Contract labor | 38,670 | $32,467 | 6,203 |
| Depreciation | 18,956 | -0- | 18,956 |
| Insurance | 25,500 | 9,823 | 15,677 |
| Legal and professional service | 5,345 | -0- | 5,345 |
| Office | 12,410 | -0- | 12,410 |
| Rent or lease | 28,000 | 4,400 | 23,600 |
| Repairs and maintenance | 2,300 | -0- | 2,300 |
| Supplies | 5,250 | 82 | 5,168 |
| Taxes and licenses | 408 | -0- | 408 |
| Travel | 14,200 | -0- | 14,200 |
| Meals and entertainment | 2,855 | -0- | 2,855 |
| Wages | 5,440 | -0- | 5,440 |
| Other | [1]51,760 | [2]1,092 | 50,668 |

[1]Petitioners' "other expenses" consisted of $11,740 for "communications", $10,150 for "professional dues and fees", $8,150 for "uniforms and upkeep", and $21,720 for "continuing education".

[2]Expense deductions allowed by respondent consisted of $738 for the "licensing fees" paid to the Medical Board of California, $125 of "dues", and $229 for "telephone expenses".

Respondent determined that Dr. Najle-Rahim's medical practice had unreported gross receipts of $31,030 for 2009, $143,514 for 2010, and $240,626

[*26] for 2011. On the basis of Revenue Agent Cota's bank deposits analysis, respondent determined that with respect to her medical practice Dr. Najle-Rahim paid business expenses of $38,712 in 2009, $49,401 in 2010, and $47,864 in 2011. Respondent also determined that the $90,000 of lawsuit settlement proceeds that Deutsch agreed to pay Mr. Ghadiri-Asli in 2010 should be included in petitioners' gross income; respondent allowed an itemized deduction for the $35,000 of attorney's fees that his attorney withheld from the proceeds.

VII. Determination and Approval of Penalties

The fraud penalties (and alternative section 6662(a) accuracy-related penalties) determined in the notice of deficiency for each year at issue were proposed by Revenue Agent Cota, who examined petitioners' returns for those years. The penalties were approved in writing by William Gustafson, Revenue Agent Cota's immediate supervisor, before they were first formally communicated to petitioners.

VIII. Notice of Deficiency

On March 19, 2015, respondent issued petitioners a notice of deficiency reflecting the determinations described above. Petitioners timely petitioned this Court.

**[*27]** IX.    Dr. Najle-Rahim's Request for Relief Under Section 6015

On October 17, 2018, Dr. Najle-Rahim filed a Form 8857, Request for Innocent Spouse Relief, requesting relief from joint and several liability for each of the years at issue pursuant to section 6015.  This filing was made less than two weeks before the trial in this matter.  On Part III of the request for relief, Dr. Najle-Rahim indicated that she and Mr. Ghadiri-Asli had filed joint tax returns because "[w]e were married and we filed together", and she checked the box affirming she had signed the joint tax returns.  Question 13 of Part III asks about the applicant's involvement in preparing the tax returns.  Dr. Najle-Rahim checked the boxes indicating:  "You gathered receipts and cancelled checks", "You gave tax documents (such as Forms W-2, 1099, etc.) for the preparation of the returns", and "You did not review the returns before they were filed.  Explain below why you did not review the returns."  As her explanation Dr. Najle-Rahim wrote:  "I filled out a paper provided by tax preperar [sic] and wrote on that paper my expenses and insurances and mileages.  My husband took that paper with 1099 froms [sic] to the tax preperar [sic]."  The record does not reveal what action, if any,

[*28] respondent has taken with respect to Dr. Najle-Rahim's request for relief pursuant to section 6015.[9]

OPINION

I. Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous.[10] Rule 142(a); see INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933). In the case of the fraud penalty under section 6663, the Commissioner bears the burden of proof. Sec. 7454(a); Rule 142(b).

In cases involving failure to report income, the U.S. Court of Appeals for the Ninth Circuit, to which any appeal in this case would ordinarily lie, see sec. 7482(b)(1)(A), has held that the Commissioner must establish "some evidentiary foundation" linking the taxpayer to an alleged income-producing activity before

---

[9]Dr. Najle-Rahim's eligibility for sec. 6015 relief is not at issue in this proceeding.

[10]Sec. 7491(a) provides that in certain circumstances the burden of proof with respect to factual matters may shift to the Commissioner. Petitioners do not argue that sec. 7491(a) applies, nor have they shown that they meet its requirements to shift the burden of proof. Consequently, the burden of proof remains with petitioners, except as otherwise described herein.

**[*29]** the presumption of correctness attaches to the deficiency determination, Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). Once the Commissioner has established such a foundation, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that the IRS' determinations are arbitrary or erroneous. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97. Respondent has established a sufficient evidentiary foundation to satisfy any threshold burden as relates to his determinations of unreported income from Dr. Najle-Rahim's medical practice.

II. General Principles of Income Taxation

A. Unreported Income

Under section 61(a), "gross income means all income from whatever source derived". See Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955). The Supreme Court has repeatedly emphasized the "'sweeping scope' of this section [61] and its statutory predecessors." Commissioner v. Schleier, 515 U.S. 323, 327 (1995).

Section 6001 requires taxpayers to maintain sufficient records to allow the IRS to determine their correct tax liability. Section 446(b) confers broad powers on the Secretary and his delegate, i.e., the Commissioner, to compute the taxable

[*30] income of taxpayers who fail to keep adequate books and records. See

Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989); sec. 1.446-1(b)(1), Income

Tax Regs. The Commissioner may use indirect methods to reconstruct income.

Holland v. United States, 348 U.S. 121 (1954) (upholding the net worth method of

reconstructing income). The reconstruction need only be reasonable in the light of

all surrounding facts and circumstances. Petzoldt v. Commissioner, 92 T.C. at

687.

Petitioners failed to keep adequate records, and they provided hardly any of

the information Revenue Agent Cota requested from them. She therefore

reconstructed their income using the bank deposits method. A bank deposit is

prima facie evidence of income, and the Commissioner need not prove a likely

source of that income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of

Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), aff'd, 566 F.2d 2 (6th Cir.

1977). Courts have often accepted this method of income reconstruction in the

absence of adequate books and records. See Mills v. Commissioner, 399 F.2d

744, 749 (4th Cir. 1968), aff'g T.C. Memo. 1967-67; Clayton v. Commissioner,

102 T.C. 632, 645 (1994). The bank deposits method assumes that all money

deposited into a taxpayer's bank account during a given period constitutes taxable

income, but the Commissioner must take into account any nontaxable source or

**[*31]** deductible expense of which he has knowledge.  Clayton v. Commissioner, 102 T.C. at 645-646; DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).  The Commissioner's calculations need not be completely correct for the bank deposits analysis to be valid.  DiLeo v. Commissioner, 96 T.C. at 868.

Once the Commissioner reconstructs a taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the Commissioner's use of the bank deposits method is unfair or inaccurate.  See Clayton v. Commissioner, 102 T.C. at 645; DiLeo v. Commissioner, 96 T.C. at 882-883.  A taxpayer may do so, in whole or in part, by proving that a deposit is not taxable.  See DiLeo v. Commissioner, 96 T.C. at 882-883.

Revenue Agent Cota used the leads generated by her bank deposits analysis to contact C&L and procure their monthly and annual summaries which documented Dr. Najle-Rahim's self-reported income for the years at issue. Revenue Agent Cota also acquired transcripts of the Forms 1099-MISC issued to petitioners by Medicare, Medi-Cal, and the insurance companies (i.e., third-party payors) that paid for services rendered by Dr. Najle-Rahim.

[*32]  B.    Substantiation of Deductions

Section 162(a) entitles a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  In general, no deduction is allowed for personal, living, and family expenses.  Sec. 262.

The taxpayer bears the burden of establishing entitlement to claimed deductions.  INDOPCO, Inc. v. Commissioner, 503 U.S. at 84; Welch v. Helvering, 290 U.S. at 115; see Rule 142(a).  Taxpayers are required to maintain sufficient books and records to substantiate their claimed deductions.  Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.  In certain circumstances, if a taxpayer establishes that a deductible expense has been paid or incurred but is unable to substantiate the precise amount, we may estimate the amount of the deductible expense, bearing heavily against the taxpayer responsible for the inexactitude.  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).  We cannot estimate deductible expenses, however, unless the taxpayer presents evidence providing a sufficient basis for making an estimate.  Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).  Without such a basis, any allowance would amount to unguided largesse.  Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957).

**[\*33]** The <u>Cohan</u> rule is inapplicable to expenses governed by the strict substantiation requirements of section 274. Section 274(d) provides that no deduction or credit shall be allowed for, inter alia, any traveling expense or entertainment expense, or any expense related to listed property as defined in section 280F(d)(4),[11] unless the taxpayer substantiates through adequate records or sufficient evidence corroborating his or her own statement the amount of the expense, the time and place of the expense, and the business purpose of the expense. A taxpayer may satisfy the "adequate records" test if he or she maintains an account book, a diary, a log, a statement of expense, trip sheets, or similar records prepared at or near the time of incurring the expenditure and documentary evidence of certain expenditures, such as receipts or paid bills, that show each element of each expenditure or use. <u>See</u> sec. 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). In the absence of adequate records to establish each element of an expense under section 274(d), a taxpayer may alternatively establish each element: "(A) By his own statement, whether written or oral, containing specific information in detail as to such element; and (B) By other corroborative evidence sufficient to establish such element." Sec. 1.274-

___

[11]Listed property includes passenger automobiles, any other property used as a means of transportation, and property generally used for purposes of entertainment, recreation, or amusement. Sec. 280F(d)(4).

**[*34]** 5T(c)(3)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46020 (Nov. 6, 1985). The taxpayer is not allowed a deduction or credit on the basis of approximations or unsupported testimony. Id. para. (a), 50 Fed. Reg. 46014.

III.   Dr. Najle-Rahim's Medical Practice

   A.   Gross Receipts

Respondent determined that Dr. Najle-Rahim's medical practice had unreported gross receipts of $31,030 for 2009, $143,514 for 2010, and $240,626 for 2011. As shown in the table below, these determinations are based on the differences between the gross receipts as indicated on the C&L summaries and the gross receipts petitioners' reported on their Schedules C for the years at issue.

|  | Gross receipts | | |
| --- | --- | --- | --- |
| Year | C&L | Schedule C | Difference |
| 2009 | $453,030 | $422,000 | $31,030 |
| 2010 | 570,908 | 427,394 | 143,514 |
| 2011 | 515,949 | 275,323 | 240,626 |

The C&L summaries are based on amounts that Dr. Najle-Rahim reported to C&L using the explanation of benefits forms she received. Petitioners assert that the C&L summaries do not accurately reflect the amounts received by Dr. Najle-Rahim for her medical services, even though she always paid the 6% fee that C&L

[*35] calculated on the basis of these same amounts as reported on these summaries.

Petitioners argue that the C&L summaries fail to take into account amounts Dr. Najle-Rahim was obligated to refund to Medicare, Medi-Cal, and the insurance companies for overpayments because, they say, the explanation of benefits forms Dr. Najle-Rahim received did not report overpayments. However, they have provided no evidence to support their assertion. Dr. Najle-Rahim supplied C&L all of the information it used in preparing the monthly and annual summaries, and those summaries take into account the overpayment refund obligations. Moreover, the gross receipts included on C&L's monthly and annual summaries are broadly consistent with Revenue Agent Cota's bank deposits analysis as well as the gross receipts reported on Dr. Najle-Rahim's Forms 1099-MISC.[12] As part of her bank deposits analysis, Revenue Agent Cota examined all inflow and outflow transactions with respect to petitioners' bank accounts.

Petitioners argue that "there are differences between C&L report and 1099 (which are sometimes not reflecting all the paid claims for the same year[)]."

---

[12]Indeed, petitioners benefited from respondent's use of the C&L summaries in calculating Dr. Najle-Rahim's gross receipts inasmuch as for 2009 and 2010 the C&L amounts are less than those indicated by the bank deposits analysis or reported on the Forms 1099-MISC.

[*36] They further assert that the Forms 1099-MISC are incorrect. For example, on brief they assert: "Per response to request for admission not all 1099 reflects accurate payments. In some instance like [K]aiser 1099 in 2010 were 10 times higher than received claims payment." Petitioners, however, have presented no evidence to support their claims. And, as previously noted, the amounts reported on the Forms 1099-MISC are very close to the amounts calculated through the bank deposits analysis as well as the amounts reported on the C&L monthly and annual summaries.

On the basis of all the evidence in the record, we sustain respondent's determinations with respect to Dr. Najle-Rahim's gross receipts for the years at issue.

B.      Business Expenses

On the basis of Revenue Agent Cota's bank deposits analysis, respondent determined that with respect to her medical practice Dr. Najle-Rahim paid business expenses of $38,712 in 2009, $49,401 in 2010, and $47,864 for 2011. By their own admission, petitioners maintained no records regarding Dr. Najle-Rahim's medical practice even though they directly handled all payments. Petitioners assert on brief that they "had a shoe box of receipts that Mr. Young did not look at". However, petitioners provided no such documentation to the Court

[*37] to substantiate any of their claimed business expenses.[13]  In fact, at trial Dr. Najle-Rahim conceded that the rent expenses reported on petitioners' income tax returns were "much higher" than the amounts she actually paid in rent.[14]  Petitioners have failed to show that they are entitled to business expense deductions greater than respondent has allowed.

IV.  Mr. Ghadiri-Asli's 2010 Lawsuit Settlement

In 2010 Mr. Ghadiri-Asli settled his lawsuit against Deutsch and Mr. Titcombe for $90,000.  After his attorneys netted $35,000 for their fees, Mr. Ghadiri-Asli received $55,000.  Petitioners failed to report any amount of the settlement proceeds and claimed no associated deduction on their 2010 Federal income tax return.  In the notice of deficiency, respondent adjusted petitioners' 2010 Federal income tax return to include the $90,000 of settlement proceeds in

[13]Near the conclusion of the trial, petitioners' counsel offered into evidence copies of some documents that had not been exchanged or identified in writing as required by our standing pretrial order dated September 7, 2018.  Respondent objected to the admission of the evidence on the basis of prejudice, and the Court sustained the objection.  Materials not provided in compliance with our pretrial orders may be excluded from evidence.  See, e.g., Schaefer v. Commissioner, T.C. Memo. 1998-163, aff'd, 188 F.2d 514 (9th Cir. 1999).

[14]On their tax returns, petitioners claimed rent expense of $16,120, $42,624, and $28,000 for 2009, 2010, and 2011, respectively.  In fact, Dr. Najle-Rahim's rent was no more than $400 per month until February 2011, when it increased to $1,000 per month.

**[\*38]** petitioners' gross income and allowed an itemized deduction for the $35,000 of attorney's fees.

Generally, gross income includes all income from whatever source derived, including settlement proceeds. <u>See</u> sec. 61(a); <u>Commissioner v. Schleier</u>, 515 U.S. at 327-328. As an exception to this general rule, section 104(a)(2) excludes from gross income "the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness". Damages received for emotional distress are not excludable from gross income unless they are for medical care attributable to emotional distress. Sec. 104(a) (flush language).

In deciding whether petitioners qualify for the exclusion under section 104(a)(2), our analysis begins with the terms of the settlement agreement. <u>See</u> <u>Rivera v. Baker W., Inc.</u>, 430 F.3d 1253, 1257 (9th Cir. 2005) ("Thus, when damages are paid through a settlement agreement, we will look first to the underlying agreement to determine whether it expressly states that the damages compensate for 'personal physical injuries or physical sickness' under § 104(a)(2)."). The settlement agreement expressly allocates the $90,000 settlement amount to "alleged emotional distress". Nothing in the record supports a conclusion that the settlement amount was paid for physical injuries or physical

[*39] sickness.  Petitioners have not shown that any part of the settlement amount was for medical care attributable to emotional distress.  Consequently, the $90,000 payment is not excludable under section 104(a)(2).  See Doyle v. Commissioner, T.C. Memo. 2019-8; Barbato v. Commissioner, T.C. Memo. 2016-23.

Moreover, it is well established that "taxable recoveries in lawsuits are gross proceeds in their entirety to the party-client and that associated legal fees-- contingent or otherwise--are to be treated as deductions."  Banks v. Commissioner, 543 U.S. 426 (2005); Kenseth v. Commissioner, 114 T.C. 399, 411 (2000), aff'd, 259 F.3d 881 (7th Cir. 2001).  Consequently, we sustain respondent's determination including the full $90,000 in petitioners' gross income and allowing an itemized deduction with respect to the $35,000 of attorney's fees.

## V. Civil Fraud Penalty

Respondent asserts that for each year at issue both petitioners committed fraud with respect to their Federal income tax returns.  Consequently, respondent argues, they are liable for fraud penalties under section 6663.

### A. General Principles

If any part of any underpayment of tax required to be shown on a return is due to fraud, there is an addition to tax of 75% of the portion of the underpayment that is attributable to fraud.  See sec. 6663(a).  If the Commissioner establishes

[*40] that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as due to fraud unless the taxpayer can establish by a preponderance of the evidence that portion of the underpayment which is not attributable to fraud.  Sec. 6663(b).

Fraud is the intentional wrongdoing of a taxpayer to evade tax believed to be owing.  See Petzoldt v. Commissioner, 92 T.C. at 698.  Fraud is never imputed or presumed.  Parks v. Commissioner, 94 T.C. 654, 660 (1990).  The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Id.; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978).

In the case of a joint tax return, section 6663 does not apply with respect to a spouse unless some part of the underpayment is due to the fraud of that spouse. Sec. 6663(c).  Respondent seeks to impose the section 6663 fraud penalty on both Mr. Ghadiri-Asli and Dr. Najle-Rahim.  Consequently, respondent must prove that each spouse committed fraud.

To establish fraud, the Commissioner must prove for each year at issue that: (1) an underpayment of tax exists and (2) the taxpayer had fraudulent intent, i.e., that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Parks v.

[*41] Commissioner, 94 T.C. at 660-661; see Clayton v. Commissioner, 102 T.C. at 647. The Commissioner must prove these elements by clear and convincing evidence. Sec. 7454(a); see Petzoldt v. Commissioner, 92 T.C. at 699. Because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601. The taxpayer's entire course of conduct may be examined to establish the requisite intent. Stone v. Commissioner, 56 T.C. 213, 224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969); Romer v. Commissioner, T.C. Memo. 2001-168.

### B. Supervisory Approval

As a threshold matter, respondent must show that he complied with section 6751(b)(1), which requires that certain penalties be personally approved in writing by the immediate supervisor of the individual making the determination. See Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). Respondent has satisfied his burden of production with regard to the supervisory approval requirement of section 6751(b) (and petitioners do not contend otherwise).

**[*42]** C.    <u>Underpayment of Income Tax</u>

Respondent must prove an underpayment of tax in support of each fraud penalty.  To sustain his burden, respondent need not prove the precise amount of any deficiency attributable to fraud, but only that a part of the deficiency is attributable to fraud.  <u>See</u> <u>Estate of Beck v. Commissioner</u>, 56 T.C. 297, 363-364 (1971).  Because the allegations of fraud are intertwined here with unreported income and indirectly reconstructed income, respondent may prove an underpayment by proving a likely source of the unreported income.  <u>See</u> <u>id.</u> at 361.  As we stated in <u>Said v. Commissioner</u>, T.C. Memo. 2003-148, 85 T.C.M. (CCH) 1353, 1356 (2003), <u>aff'd</u>, 112 F. App'x 608 (9th Cir. 2004):

> An underpayment will exist where unreported gross receipts are not exceeded by costs of goods sold and deductible expenses.  In establishing the underpayment, the Commissioner may not simply rely on the taxpayer's failure to prove error in the deficiency determination.  <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); <u>Parks v. Commissioner</u>, 94 T.C. 654, 660-661 (1990); <u>Otsuki v. Commissioner</u>, 53 T.C. 96, 106 (1969).  However, upon clear proof of unreported receipts, even in a criminal case, the burden of coming forward with offsetting costs or expenses generally shifts to the taxpayer.  <u>See</u> <u>Siravo v. United States</u>, 377 F.2d 469, 473-474 (1st Cir. 1967); <u>Elwert v. United States</u>, 231 F.2d 928, 933 (9th Cir. 1956).

As previously discussed, respondent has shown sources of unreported income to petitioners from Dr. Najle-Rahim's medical practice as well as Mr.

**[\*43]** Ghadiri-Asli's 2010 lawsuit settlement. As a result, it is established by clear and convincing evidence that petitioners had an underpayment of tax for each year at issue.

D.  Fraudulent Intent

Fraudulent intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including the consistent understatement of income, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment of income or assets, and failure to cooperate with tax authorities. See Estate of Trompeter v. Commissioner, 279 F.3d 767, 773 (9th Cir. 2002), vacating and remanding 111 T.C. 57 (1998); Bradford v. Commissioner, 796 F.2d at 307-308. Although no single factor is necessarily sufficient to establish fraud, a combination of several factors is persuasive circumstantial evidence of fraud. Bradford v. Commissioner, 796 F.2d at 307-308. An intent to mislead may be inferred from a pattern of conduct, see Spies v. Commissioner, 317 U.S. at 499 ("[W]e would think affirmative willful attempt may be inferred from conduct[.]"), or from a taxpayer's entire course of conduct, see Stone v. Commissioner, 56 T.C. at 223-224. Although mere underreporting of gross receipts or income is insufficient to support a finding of fraud, "repeated understatements in successive years when coupled with other

**[\*44]** circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud." Furnish v. Commissioner, 262 F.2d 727, 728-729 (9th Cir. 1958), aff'g in part and remanding 29 T.C. 279 (1957). A taxpayer's background and the context of the events in question may be considered circumstantial evidence of fraud. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); see Spies, 317 U.S. at 497; United States v. Murdock, 290 U.S. 389, 395 (1933).

The facts in this case include many badges of fraud. Over the three years at issue petitioners consistently and substantially understated their income and overstated expenses. Significantly, the understatements of gross receipts grew each year, from $31,030 in 2009, to $143,514 in 2010, to $240,626 in 2011. The gap between the income received and that reported on petitioners' return each year is too substantial for them to have overlooked when they signed the returns. Petitioners have offered no explanation except to contend, without supporting evidence, that the financial documentation used by respondent, i.e., the bank records, C&L monthly and annual summaries, and Forms 1099-MISC, are inaccurate.

Petitioners' records were inadequate. Dr. Najle-Rahim maintained no books or records with respect to her medical practice. She received invoices as well as

[*45] monthly and annual summaries provided by C&L and paid C&L's commissions as calculated on the basis of the information in this documentation. Although petitioners deducted these commissions for tax purposes, they failed to include in gross income, or apprise their tax preparer about, substantial amounts of income reflected in this same documentation.

Petitioners concealed income. Mr. Ghadiri-Asli provided only some of Dr. Najle-Rahim's Forms 1099-MISC to Mr. Young, who performed no independent review of his clients' tax materials but relied on the accuracy of the information petitioners gave him. Moreover, petitioners provided Mr. Young false information about their business expenses, including (by way of example) rent expenses that Dr. Najle-Rahim acknowledges were much higher than the rents she actually paid. Petitioners' giving false information to their return preparer is a badge of fraud. See Cole v. Commissioner, T.C. Memo. 1998-452.

Petitioners were uncooperative during Revenue Agent Cota's examination. Aside from providing bank statements for only one bank account for one year, they failed to provide Revenue Agent Cota any of the documents requested in four IDRs, including any records for their numerous other bank accounts, any C&L records, any of the Forms 1099-MISC Dr. Najle-Rahim received, or any records to substantiate their claimed expenses. Petitioners' lack of cooperation with Revenue

[*46] Agent Cota's requests necessitated her summoning third parties to obtain the information and to prepare a bank deposits analysis.

Although petitioners lack expertise in tax law, they are sophisticated and intelligent professionals. Dr. Najle-Rahim is a specialist in infectious disease and has successfully operated her own medical practice for years. Careful attention to detail is required in her profession both to diagnose and care for patients and to properly prepare the paperwork necessary to operate her practice. She kept her patients' files organized, not just to properly treat them but also so that she could transmit them to C&L so as to timely receive payment for her services. Dr. Najle-Rahim was able to maintain files containing the explanation of benefits forms and timely transmit them to C&L. Indeed, these records were maintained so accurately that respondent's adjustment with respect to the C&L billing expense for each of the years at issue was minimal.

Likewise, Mr. Ghadiri-Asli is a well-educated professional. His most recent employment involved significant management responsibilities as an industrial engineer. After leaving that position, he was intimately involved in the administrative aspects of Dr. Najle-Rahim's medical practice, including depositing payments from the medical practice into petitioners' bank accounts and working with Mr. Young in preparing the tax returns.

[*47] In their arguments, petitioners attempt to shift responsibility to Mr. Young and assert that they were not responsible for the expenses reported on their income tax returns for the years at issue. At trial Dr. Najle-Rahim testified that she did not make various expense entries on the 2010 business expense template. For example, she denied that she wrote in the office rent expenses of $36,000 or postage expenses of $4,500. On brief petitioners assert that with respect to the business expense template, "Dr. Rahim dose [sic] not believe that these numbers clearly written and dose [sic] not recall all the expenses with written numbers in front of them. Per respondent, there was a willful blindness, but per Dr. Rahim it was an unwilling blindfold." Continuing, petitioners assert that they "trusted their tax preparer and did not have knowledge about tax preparation and [S]chedule C."

Petitioners' unsupported assertions lack credibility. At trial Mr. Young credibly testified that Mr. Ghadiri-Asli informed him that Dr. Najle-Rahim completed the business expense template. Consistent with that testimony, on her Form 8857 Dr. Najle-Rahim stated under penalties of perjury: "I filled out a paper provided by tax preperar [sic] and wrote on that paper my expenses and insurances and mileages. My husband took that paper with 1099 froms [sic] to the tax preperar [sic]."

**[*48]** Mr. Ghadiri-Asli acknowledged at trial that he had not provided Mr. Young with all of the Forms 1099-MISC reporting payments to Dr. Najle-Rahim. In circumstances such as this "[r]eliance on a bookkeeper or accountant is no defense to fraud if the taxpayer failed to provide the accountant 'with all of the data necessary for maintaining complete and accurate records.'" Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986) (quoting Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), aff'g T.C. Memo. 1959-172), aff'g per curiam T.C. Memo. 1985-63.

Both petitioners participated in this fraud. Dr. Najle-Rahim reported untrue business expenses, and both petitioners participated in concealing their income. Respondent has proven by clear and convincing evidence that for each year at issue petitioners had an underpayment of tax due to fraudulent intent. Petitioners have not proven that any specific portion of any underpayment of tax was not attributable to fraud. See sec. 6663(b). Consequently, we hold that for each year at issue petitioners are liable for the section 6663 fraud penalty based upon the underpayments to be determined in the Rule 155 computations.

VI.    Section 6662(a) Accuracy-Related Penalty

Respondent has determined, as an alternative to the section 6663 fraud penalty, accuracy-related penalties pursuant to section 6662(a). Section 6662(a)

**[\*49]** imposes a penalty equal to 20% of the portion of an underpayment that is attributable to, inter alia, (1) negligence or (2) any substantial understatement of income tax. Sec. 6662(a) and (b)(1) and (2). However, the accuracy-related penalty "shall not apply to any portion of an underpayment on which a penalty is imposed under section 6663." Sec. 6662(b). As we have already held that petitioners are liable for the section 6663 fraud penalty, the section 6662(a) accuracy-related penalty is not applicable.

To reflect the foregoing and the parties concessions,

Decision will be entered under Rule 155.